Judgment for the United States.

## Case No. 15,945.

### UNITED STATES v. ONE HUNDRED BARRELS OF CEMENT.

[3 Am. Law Reg. (N. S.) 735.]

District Court, E. D. Missouri. Sept., 1862.

FORFEITURE—INTERCOURSE WITH INSURRECTIONARY STATES—STATUS OF CITIZENS OF REBELLIOUS STATES—LICENSE—REGULATIONS.

1. By the act of congress of 13th July, 1861 [12 Stat. 255], and the president's proclamation in pursuance thereof, citizens of the rebellious states have prima facie become, for purposes of commerce, quasi enemies, and cannot sue in the United States courts.

[Cited in Brown v. Hiatt, Case No. 2,011.]
[Cited in Perkins v. Rogers, 35 Ind. 138.]

2. But the president having power, through the secretary of the treasury, to make regulations permitting trade in certain cases, the granting of a license, in pursuance of this power, restores the standing of the grantee, so as to enable him to be heard in the United States courts.

3. The act of foreign nations in recognizing the so-called Confederate States as a belligerent, estops their subjects from disputing the lawfulness of captures on the high seas by the United States forces. But such recognition has no influence on the courts of the United States, who are guided solely by the action of the political department of their own government.

4. Therefore, in determining the status of Rebel persons and property, the courts are guided by municipal and not by international law.

5. The acts of congress of 13th July, 1861, and 20th May, 1862 [12 Stat. 404], are prohibitory acts, and the forfeiture under them of goods "proceeding to" rebellious states can only be avoided by the production of such a license as is provided in the acts. Therefore, a license obtained through error or mistake or fraud will not prevent the forfeiture.

Libel of information [against one hundred barrels of cement; Hicks & Cocke, claimants] for violation of the 5th section of the act of congress approved July 13th, 1861.

W. W. Edwards and C. S. Hayden, for the United States.

J. K. Knight, for claimants.

TREAT, District Judge. The material facts are substantially as follows: In July last. Messrs. Hicks & Cocke, copartners in a hotel business at Jackson. Tennessee, were residents and citizens of that state, and loyal to the United States. Messrs. Harman & Daily, of the same place, were copartners in a saloon. Early in that month Messrs. Harman & Daily, with Mr. Cocke, visited St. Louis, Missouri, and purchased respectively the goods contained in lot No. 41. Messrs. Harman & Daily bought twenty-one half-barrels of whiskey, had the same packed in barrels of salt for concealment, and caused the same to be shipped on the steamer G. W. Graham, consigned to Messrs. Hicks & Cocke, at Jackson. Mr. Cocke bought the other goods in said lot No. 41, and had the same shipped on said steamer also. Mr. Harman applied at the custom-house. in the name of Hicks & Cocke, for the necessary permit for all the goods, filed what purported to be copies of the invoices, made the required oath, and received a permit for Hicks & Cocke to ship to Jackson the whole lot named, to be delivered to them at the latter place. After said goods were on board the steamer, they were seized, the whiskey concealed in the salt having been detected; all of the goods were included in the same permit, and shipped on the same steamer for the same destination, and consigned to the same persons. The regulations of the treasury department for such shipments contained at that time the following provisions: "All applicants for permits to ship and trade, shall make and file with the officer granting the permit, an affidavit that the values of all merchandise are correctly stated in the invoices, true copies of which shall be annexed to the affidavit, and that the packages contain nothing except as stated in the invoices; . . . and furthermore, that the applicant is loyal to the government of the United States. and will in all things so deport himself." "No permits shall be granted to ship merchandise to states. or parts of states, heretofore declared to be in insurrection, except for delivery to such persons residing or doing business therein. as shall be recommended therefor by an officer of government. duly authorized to make such recommendation." "No permits shall be granted to ship intoxicating drinks," &c. The object of these conditions is obvious, viz., to prevent from being forwarded to the insurrectionary states, any merchandise which may be used in aid of the insurgents. or for the demoralization of the United States army there.

All commercial intercourse with Tennessee was interdicted from the date of the president's proclamation of August 16th, 1861 [12 Stat. 262]. except so far as the president had relaxed, or might relax, such interdict with respect to any particular part of the state, or with respect to specified persons. The rule is similar to that recognised by publicists, as in force during foreign wars, viz., that "all intercourse by a citizen of one nation with the adverse belligerent, except by special license of the sovereign, is unlawful, subjecting vessel and cargo to forfeiture; and a licensed vessel is to be treated as belonging to the country under whose license she sails." Every citizen therefore who. during a war, carries on intercourse with the enemy's country without such special license, is faithless to his allegiance, and subjects himself personally to such punishment as his sovereign may impose, and the property shipped, to confiscation as lawful prize. The Liverpool Packet [Case No. 8,406]; The Emulous [Id. 4.479]; The Joseph, 8 Cranch [12 U. S.] 461; The Rugen. 1 Wheat. [14 U. S.] 62; Schole-field v. Eichelberger, 7 Pet. [32 U. S.] 586; The Hoop. 1 C. Rob. Adm. 196; The Rapid, 8 Cranch [12 U. S.] 155; Wheat. Mar. Capt. pp. 209, 212, 219, c. 7; Jecker v. Montgomery, 18 How. [59 U. S.] 110; Griswold v. Waddington. 16 Johns. 438. As then all commercial intercourse with Tennessee was legally interdicted, all goods shipped to that state without a license were forfeited to the United States. By the terms of said act, the president was authorized to grant special licenses for trade, under such regulations as might be prescribed therefor by the secretary of the treasury. The political department alone has the power to decide the status of a state, or rather of its inhabitants, as to "a condition of hostilities" or "insurrection" against the United States government; and when its decision is made, the courts must apply the rules applicable thereto. That status must remain, in a legal sense, until the same authority decides it to be at an end. Such is the true interpretation of the statute and proclamation. U. S. v. One Hundred and Twenty-Nine Packages [Case No. 15.941], decided by this court at this term: [Rose v. Humly] 4 Cranch [8 U. S.] 241; [Fosker v. Neilson] 2 Pet. [27 U. S.] 253; [Martin v. Mott] 12 Wheat. [25 U. S.] 19; [Luther v. Borden] 7 How. [48 U. S.] 1; [Kennett v. Chambers] 14 How. [55 U. S.] 46; [The Fortuna] 3 Wheat. [16 U. S.] 246; [U. S. v. Palmer] Id. 610; [The Divina Paskora] 4 Wheat. [17 U. S.] 52; [The Neustra De La Caridad] Id. 497; [The Santissima Trinidad] 7 Wheat. [20 U. S.] 283. The goods in question having been seized for "proceeding to" an insurrectionary state. and the fact that they were so proceeding having been established, the onus is on the claimant to show that he had the required license or permit. If he were before the court, in a formal manner, prior to default taken, contesting by claim and answer the question of forfeiture, the United States district attorney could only by an exceptive allegation. or by a plea of abatement, dispute his right to be heard, or his persona standi in

judicio. U. S. v. Four Hundred and Twenty-Two Casks of Wine, 1 Pet. [26 U. S.] 547; Adm. Rule Sup. Ct. 26; Adm. Rule Dist. Ct. 45. By consent, the default in this case was set aside, and these claimants permitted to put in their claim and answer.

The first proposition presented to the court relates to the legal standing of the claimant. "An alien enemy cannot sue, nor can he be heard as claimant in the courts of the belligerent captors." [The Adventure] 8 Cranch [12 U. S.] 226; [The Anne] 3 Wheat. [16 U. S.] 446; 6 C. Rob. Adm. 24, 138, 199; 1 Dod. 244, 451; 3 Phil. §§ 461–466; 3 C. Rob. Adm. 143; 5 C. Rob. Adm. 199, 218; 2 C. Rob. Adm. 1; [The Frances] 8 Cranch [12 U. S.] 355, 418; [Bolchos v. Darrell, Case No. 1,-607]; [Rapalje v. Emory] 2 Dall. [2 U. S.] 54; [Ware v. Hylton] 3 Dall. [3 U. S.] 231; 1 C. Rob. Adm. 196; The Rapid [Case No. 11,-576]; [Jecker v. Montgomery] 18 How. [59 U. S.] 110; 16 Johns. 438. The position of the insurrectionists towards the United States government, at this time, is one of open hostility, and all the inhabitants are quasi enemies, but not alien enemies. Like American citizens domiciled in England during the war of 1812, although they still owe paramount allegiance to the United States, and are, therefore, neither aliens nor enemies, technically, yet their personal property follows their domicil,—"mobilia sequuntur personam,"—and is, when afloat on the high seas, pronounced in law, "adherent to the enemy;" for they are under the dominion of the insurrectionary forces, and within the territory over which hostile sway is maintained. [Ennis v. Smith] 14 How. [55 U. S.] 424; [Black v. Zacharie] 3 How. [44 U. S.] 483; [The Venus] 8 Cranch [12 U. S.] 253; [U. S. v. Guillem] 11 How. [52 U. S.] 47; 1 C. Rob. Adm.' 86, 102; U. S. v. Hayward [Case No. 15.336]; [Thirty Hogsheads of Sugar v. Boyle] 9 Cranch [13 U. S.] 191; [U. S. v. Rice] 4 Wheat. [17 U. S.] 246, 254; [Inglis v. Sailor's Snug Harbor] 3 Pet. [28 U. S.] 99; [Shanks v. Dupont] Id. 242; [Fleming v. Page] 9 How. [50 U. S.] 603; The Rapid [Case No. 11,576]; 1 C. Rob. Adm. 198. The act of 1861 and the proclamation recognize this as an organized insurrection, extending over the states and parts of states named; and the so-called Confederate government, at an early day, ordered all who did not adhere thereto, to leave those states within a prescribed period, under the penalty of being treated as alien enemies. The same general principles which regulate the status of persons, as to their personal property during foreign wars, were incorporated into this act of congress, so far as commercial intercourse is concerned. The reasons of the rule, therefore, forbidding alien enemies to sue, are just as applicable to resident citizens of the insurrectionary states now, as to the subjects of an adverse belligerent during a foreign war, viz., the necessity of stopping intercourse with the insurgents, and of preventing them from drawing supplies from the loyal states. Two countries cannot carry on war against each other whilst the citizens of each maintain and pursue all the conditions and relations of peace. Two nations cannot, in other words, be at war, and their citizens at peace. The fact of war makes all the citizens of each belligerent power, in law, the enemies respectively of each other. So in an insurrection, every loyal citizen is, in a certain sense, in a legal condition of hostility towards every insurgent. He is bound, when duly called upon, to aid in suppressing the insurrection; just as, in times of peace, he must become part of the posse, when summoned therefor, to assist in the arrest of an offender, and in the dispersion of those who obstruct the officer whilst attempting to enforce process. Indeed, every citizen not only may arrest, but ought to arrest, a criminal, flagrante delicto; and as an insurgent is a traitor, why is not every citizen clothed with power to arrest him when caught in the act of treason? In every such case, the offender, when so arrested, would be turned over to the civil magistrate. But in belligerent operations the government, for essential and universally recognised reasons, commissions officers, and musters forces under their command, to conduct its military affairs, and confines the conduct of war to them. Were this not done, gross irregularities, pillage, and general lawlessness might ensue, the policy of the government in prosecuting the contest be defeated, and each citizen, by assuming the attributes of sovereignty, thwart at will the great public purposes in view. Independent of the necessities of discipline, modern warfare forbids all private and irregular warfare, which is apt to degenerate into mere freebooting. War is the act of the state, and can be carried on lawfully only by the state.

Whether the war, or military operations, be carried on against a foreign nation, or revolted colony, or insurrectionary district, the inhabitants of such nation, colony, or district, may, in a legal point of view, be treated as occupying similar relations of hostility, so far as commercial transactions are to be affected. Such evidently is the scope and object of the act of July 13th, 1861, and such the relation in which the citizens of the insurrectionary states now stand towards the United States government. Their property afloat on the high seas, or being transported by land or water, for interdicted purposes, or unlawful commerce, is being used in violation of a positive prohibitory statute. So, whether viewed by the rules of public or municipal law, the same result would follow. As citizens, however, owing allegiance to the United States, the inhabitants of Tennessee are bound by that prohibitory statute. If quasi enemies, or even if treated as citizens of an adverse belligerent, they would be held to the same rules. In accordance

with these doctrines, the United States circuit court for Missouri has held that, pending the insurrection, the resident citizens of the insurrectionary states cannot maintain suits in that court. But in the case now before this court, it is not necessary to decide all incidental propositions connected with such a rule. If the claimants, as citizens of Tennessee, have no personæ standi at this time, by force of the general rule which would treat them as quasi enemies, are they not entitled to be heard on producing a license to trade? During a foreign war, a sovereign may license one of his own subjects to trade with the enemy, and such license would exempt the latter and his licensed property from the ordinary penalties. But if, in the course of such licensed trade, a controversy should arise as to the right of property in a cargo, between him and a subject of the adverse belligerent, with whom he had negotiated the purchase thereof; and if that cargo should be the subject of adjudication before the courts of his sovereign, whether such an alien enemy would be permitted to contest the matter, or be treated as capable of having a standing in the court, by the implications resulting from the license, it is not now necessary to discuss. The reasons of the rule, viz., that all intercourse should cease, and that no property or proceeds thereof should be transferred from or to the adverse belligerent country, must, in such a case, have been decided by the sovereign to be inapplicable to that particular transaction, otherwise the license would not have been granted. The licensed person is permitted to trade, and as a necessary consequence to complete his sales and purchases. No sale or purchase could be made without two parties thereto. Whatever might be decided in such a case, or with respect to an alien enemy under license to trade, the proposition before this court has distinguishing features, which it may be well to first consider. The citizens of Tennessee are, as to their trade, quasi enemies. The Rapid [Case No. 11,576]. They are not enemies in the full legal signification of the term; for no citizen or subject is technically an enemy. In the law of treason, a subject may be a traitor, but never an "enemy," for the moment he is pronounced an enemy, he owes no allegiance, and cannot therefore be guilty of a breach of a nonexistent obligation. "Enemy," in a legal sense, is the equivalent of the Latin word "hostis," which implies that the person is a stranger to the country—a foreigner, an alien. Hence the rule, as laid down by publicists, that an alien enemy cannot sue, is so phrased because an alien may be in a state of amity as well as of enmity. As his persona standi depends on his friendly or hostile status, the term "enemy" is used in connection with the word "alien," to designate that hostile status. The claimants here are not aliens; they are not technically ene-

mies; they are only "enemies in a qualified sense," as Justice Nelson has correctly said. They still owe paramount allegiance to the United States—are not citizens of any other recognised power. They are de jure subject to the United States laws. Those laws forbid them to carry on commercial intercourse with the loyal states, except on the conditions named. The prohibition rests not on the law of nations, but on a municipal statute or act of sovereignty, and the exception to the general prohibition is created by the same act. It probably was the intent of congress to allow such discriminations to be made between the loyal and disloyal in the insurrectionary states, as the exigencies of the government would from time to time permit. Hence the power lodged in the president by the terms of the proviso to the 5th section, under which the permit in this case was obtained; also the terms of section 8, as to remission of forfeitures. The condition of quasi enmity, under which all inhabitants of Tennessee were placed by the proclamation, was subject therefore to those exceptions, as to districts and persons, which the president might make from time to time. The temporary disqualification covering all its inhabitants, is removed as to those who have special exemptions granted to them, which exemptions are evidenced by licenses duly obtained. Alienage, the president could not remove if it existed; but the legal status of quasi enmity or hostility as to districts, or individuals thereof, he is especially empowered to remove. Hence, the simple fact that the claimants are citizens of Tennessee, might, in the absence of any other fact, deprive them temporarily of the right to sue, or appear as claimants here; but when the other fact is proved, that they have been relieved of that temporary disability, their persona standi in judicio must be considered as fully restored. Such is the rule under this statute, and such is also the rule, as will be shown, in analogous cases during foreign wars. But was said license or "permit" lawfully or fraudulently procured? This question has a double aspect. If it were not valid, then have the claimants personæ standi? Are they exempt from the general rule of disability or disqualification? And on the other hand, if it is fraudulent or invalid, then the goods were forfeited, wholly irrespective of the citizenship or personal status of the claimants. It is impossible, therefore, to decide that question without reaching a conclusion covering both points; that is, without ascertaining a fact which, if found, would be at the same time good, both in abatement and in bar. In some stages of a case it might be important to treat the question distinctively, in reference to one or the other of those pleas; but as the formal plea in abatement, or exceptive allegation, raises the question only in an inconclusive form, it is better to consider the case upon the merits rather

than on the mere technical plea or exceptive allegation. The regulations of the secretary of the treasury require, among other things, that the applicants for a permit shall submit true copies of the invoices, shall swear to their accuracy, shall take the oath of loyalty, and, if residents of a state heretofore proclaimed in insurrection, shall produce a recommendation from some duly authorized officer. In order, then, to receive such a permit, an affidavit had to be made, complying with those requirements; and as all shipments of whiskey were forbidden, except under special circumstances (the existence of which is not pretended in this case), it is evident that there was no disclosure of the real facts,—indeed, that there was a false affidavit filed at the custom-house. Harman made the application in the name of Hicks & Cocke, but the application, affidavit, invoices, recommendation, and oath of loyalty, are not produced in evidence here, nor is any one of those documents shown to the court. If the permit carries with it the usual presumption, that whatever is done by a public officer, is presumed to have been rightly done (omnia rite acta), then is not that presumption repelled by the proof that twenty-one half-barrels of whiskey were included in the permit, in direct violation of the regulations? The whiskey was concealed in barrels of salt, manifesting a design to defraud the government. Is it not also to be presumed, that if the invoice had mentioned whiskey, the officer would have done his duty by refusing a permit therefor? The claimants must bring themselves within the exceptions—the onus is on them—and when the permit is shown to have been, as to part of the goods included in it, obtained through fraud and false swearing, what credit is to be given to that paper?

Without stopping here to inquire whether such a permit, based on fraud, would be received as good for any purpose?—whether a person who has to make good his claim through such a document, will receive the aid of the court, under any circumstances, in unravelling the same, so as to separate the false from the true?—whether a false documentation is not always fatal, unless used merely to save property from the enemy?—or whether a person, acting through an agent who perpetrates a fraud, is not bound by the acts of that agent when he avails himself of what was done?—or, in other words, whether a principal is permitted to hold on to all the benefits of a fraudulent act, and at the same time escape from all the disadvantages thereof?—without going into those general inquiries, or determining whether the fraudulent act must not be repudiated or affirmed as a whole, it may be sufficient for this case to look at the testimony closely, so far as the same touches the claimants personally and directly. There is no dispute that the permit was made by fraud and false swearing, to cover the packages in which the whiskey

was concealed. It appears that Cocke, who was in St. Louis at the time, did not visit the custom-house at all. Harman acted for himself and for the claimants. He used the names of the latter to cover the prohibited articles, and procured a permit in their names, in which they are licensed both as the shippers and the persons to whom, in Jackson, the goods were to be delivered. Did the claimants know of the fraudulent use to which their names were put, and assent thereto? Independent of direct testimony, it would seem probable that persons coming here under the circumstances, and knowing the necessity of procuring a permit, and the consequence of not complying with the law, would ascertain first, whether a permit had been obtained, and secondly, whether it was correct. If Harman had caused his own goods and those of the claimants to be included in one permit, then there must have been some reason therefor. If he had not been previously empowered to use their names, why, before affirming his act or adopting it, did they not ascertain the truth? Their names had been used to cover a fraud; their goods were included in the same document with contraband goods; the whole lot, honest and fraudulent, was consigned to them; they were represented as the owners of the whole, yet they rested content therewith, without inquiry or precaution. The regulations required an oath of loyalty from the applicant himself, and a recommendation from some public officer as to his fitness to receive the goods. By looking at the permit, they must have seen that some one had evidently personated them, and represented them to be the shippers of fifty-eight packages, instead of only twenty-nine. They knew whether they had made the required affidavit; whether they had produced the needed recommendation, or furnished true copies of their invoices, and whether their invoices covered fifty-eight packages. If they did not make the application in person, did they intrust Harman with their papers, and constitute him their agent for the purpose? The testimony throws no light upon the subject. Harman swears "that neither said Hicks nor Cocke knew anything of the contraband nature of the goods shipped (the whiskey) under the same license or permit issued to said firm of Hicks & Cocke." That is very vague. When did they not know?—and why did Harman venture to make a fraudulent use of their names and papers? He could have explained the whole transaction by his testimony, and why did he not do so? His silence is suggestive. He is the only witness produced to clear up the triple fraud, and he stands before the court confessedly guilty of fraud and false swearing in this very transaction. True, Haskell swears that neither Hicks nor Cocke was present at the purchase or shipment of the whiskey, and states that Harman & Daily said to him their goods were consigned to Hicks & Cocke to save expense. That statement was evidently false; at least to the ex-

tent of creating the false impression that no other purpose induced that consignment. It is obvious that the design of Harman & Daily was fraudulent, and that their acts were equally so. As to their conduct no dispute exists. No claim is interposed for the whiskey. The simple inquiry under this head is concerning the part which these claimants took in the transaction; whether they were cognisant thereof, and suffered their names to be used for the contraband purpose. "Noscitur a sociis." Does their failure to take the proper steps to procure for themselves the necessary permit, and their adoption of that obtained by Harman for them, place them in the dilemma of either having no permit at all, or of having a fraudulent one? either alternative being fatal to their claim. [The Adeline] 9 Cranch [13 U. S.] 244; [The Fortuna] 3 Wheat. [16 U. S.] 236; [Weightman v. Caldwell] 4 Wheat. [17 U. S.] 84; [La Amistad De Rues] 5 Wheat. [18 U. S.] 385; [The Venus] Id. 127; [The Bello Corrunes] 6 Wheat. [19 U. S.] 169; 1 Wheat. Mar. Capt. 225; [The Anna Maria] 2 Wheat. [15 U. S.] 328; [McCluny v. Silliman] Id. 371; 3 C. Rob. Adm. 109; 2 C. Rob. Adm. 154, 251; Id. 1–9; [The Grand Para] 7 Wheat. [20 U. S.] 483; 1 C. Rob. Adm. 252; 5 C. Rob. Adm. 277; 1 Duer, Ins. 534, 574; 2 Wildm. Int. Law, 21; The San Jose Indiano [Case No. 12,322]; The London Packet [Id. 8,474]; The Sally [Id. 12,258]; The Alexander [Id. 164]; The Rapid [Id. 11,576]; The Betsey [Id. 1,364]; [The Fortuna] 3 Wheat. [16 U. S.] 245; [The St. Nicholas] 1 Wheat. [14 U. S.] 417; [Jones v. Shore] Id. 462; 1 Duer, Ins. 567; 1 Rob. Adm. 196, 219; 4 C. Rob. Adm. 251; 1 Dod. 387; 3 C. Rob. Adm. 9; 6 C. Rob. Adm. 127; The Joseph [Case No. 7,533]; s. c. 8 Cranch [12 U. S.] 451; 16 Johns. 438; [Scholefield v. Eichelberger] 7 Pet. [32 U. S.] 586; 1 C. Rob. Adm. 84; 2 Brown, Civ. & Adm. Law, 313, 314; 1 Kent, Comm. 143. Justice Story held in such cases that nothing but the most explicit proofs by the claimants could relieve the transaction of the presumption of illegality which arises from the fraudulent character of the papers. The Emulous [Case No. 4,479]. Similar views were expressed in The Rugen, 1 Wheat. [14 U. S.] 62; The Pizarro, 2 Wheat. [15 U. S.] 241; The Dos Hermanos, Id. 76; The Venus, 5 Wheat. [18 U. S.] 127; The London Packet, Id. 132. Indeed, that principle is a clear one, in the light of sound morals, right reason, and settled adjudications. A claimant, as actor in a cause, appears before a court to make out his right to restitution. When the documents on which he relies are fraudulent, he must certainly clear himself of the taint before his claim can be established. Doubtful or unsatisfactory testimony will not suffice. Nothing but a legal permit would entitle him to restitution. These claimants produce an illegal and fraudulent paper, and offer an excuse, personal to themselves, for the fraudulent character of that document, which, if legally permissible,

they must sustain by the clearest evidence. Considering the statute, however, as the exercise of municipal or intra-territorial sovereignty, prohibiting certain commercial operations, the claimants, no matter where residing within the territorial jurisdiction of the United States, were bound thereby, irrespective of state citizenship or residence. All citizens, loyal or disloyal, are alike subject to the law. Hence, a decision of the question as to such citizenship or residence, on the one hand, or as to the loyalty or disloyalty of claimants, on the other, is not necessary in this case. The analogies drawn from the laws of war, as laid down by publicists, may assist in solving the constitutional questions which arise concerning the powers of the federal government in suppressing insurrections, and may aid also in the interpretation of the statutes passed concerning such a condition of hostilities; but the case before the court is not one to be decided by international law, but by municipal statutes. The voyage was not between this and a foreign country during a foreign war, does not affect any supposed neutral right, and necessarily involves, therefore, no doctrine of international law regulating warlike operations between foreign belligerents. The questions are intra-territorial entirely, and relate solely to the powers and duties of the federal government, intra-territorially, under the constitution. As the power of that government to pass the act in question and to enforce the same, is conceded, or if not conceded, was satisfactorily demonstrated and decided in this court last November, the views expressed now might have been confined exclusively to the interpretation of the statute itself, and the application of its provisions to the case presented. The position of foreign nations with respect to this insurrection, it must be remembered, does not determine its status in American courts. The latter follow exclusively the decision of the political department of the United States government on that question. Even if other nations had recognised the so-called Confederate government as an independent power, their recognition would bind themselves and their subjects alone—not the United States. Those foreign nations which have recognised a state of belligerency, and assumed the position of neutrals, estop their subjects from disputing the lawfulness of captures on the high seas, according to the laws of maritime warfare. The ships and cargoes of their subjects are to be judged accordingly. But rebel property thus captured is amenable to municipal authority. All American courts are bound to treat the insurrectionary states as integral parts of the Union, and subject to its constitution and laws. In the adjudication of all such questions arising here, the United States statutes would furnish the rules of decisions. In other words, as to all foreign nations, the United States government is absolutely sovereign within its own territorial limits, and over its

own subjects. Its internal constitution is a subject with which foreign powers have no right to intermeddle. The equality and independence of nations could not otherwise exist. However much the great powers of Europe have, in times past, violated that rule, they have so far recognised its rightfulness, as to offer, always, in excuse for their violations of it some real or supposed emergency, which they claimed worked a legitimate exception to its otherwise universal application—thus doing homage to the principle even when practically assailing it.

To what extent, therefore, sovereignty is lodged in any department of our government, is an intra-territorial question exclusively. It is not to be solved by the law of nations, but by constitutional law. Each nation must settle for itself the policy of its municipal code. True, in modern civilization, the so-called public opinion of the world is not to be despised, but it is no more the law of nations than is popular opinion at home the municipal law. Public opinion, ever shifting, cannot be substituted by courts for constitutions and statute books. "Misera est servitus, ubi jus est vagum aut incertum." The statute of July 13th, 1861, is a prohibitory statute. As an act of prohibition, its violation is not necessarily or generally dependent on questions of intent. As a measure of great public policy, congress determined that all commercial intercourse mentioned therein should be stopped, except on prescribed conditions. Mistakes, accidents, or absence of evil intentions, form no exceptions. There must be no commercial intercourse, except on the conditions named—"Ita lex scripta est." If, however, a case arises calling for a relaxation of its rigor, the 8th section of the act provides a mode for securing a remission of the penalty. [The Friendschaft] 4 Wheat. [17 U. S.] 107; [Scholefield v. Eichelberger] 7 Pet. [32 U. S.] 586; The Joseph [Case No. 7,533]; s. c. 8 Cranch [12 U. S.] 451; 5 C. Rob. Adm. 293; 4 C. Rob. Adm. 118, 121; 2 C. Rob. Adm. 25; 3 C. Rob. Adm. 41; 2 Wildm. Int. Law, 48; 1 Duer, Ins. 523, 577. In the absence of a license, then, whatever goods, wares, or merchandise are seized whilst "proceeding to" an interdicted state, must be condemned. But, as in this case a license existed, it is proper to consider more fully the rules governing such transactions.

It has been clearly settled, that a license granted to an alien enemy removes all his disabilities; that the trade as to him becomes lawful, and his persona standi is restored. 1 Duer, Ins. 606; 3 Taunt. 555; 13 East. 332; 5 Taunt. 674; 15 East, 419, 525. As the license is an act of sovereignty, it is to be construed, as to the grantee, stricti juris. In some cases it has been treated strictissimi juris, and in others liberally. It is apprehended, however, that the apparent contradictions and confusion referred to in text-books, concerning the rule of construction, have no real existence. This funda-

mental rule of construction is adhered to in all the adjudicated cases, viz., that whilst private grants are to be construed most strictly against the grantor, public grants are interpreted most strictly against the grantee. The design or intent of the sovereign granting the license cannot be ignored, and the licensee must confine himself strictly within the terms of his license. Whenever a liberal construction is given to its terms, it is for the purpose of effecting the object for which it was granted; of carrying out the intent of the sovereign, and not of the grantee. Its validity depends on the good faith with which it was procured. If terms or conditions precedent are named, they must be complied with. Any fraudulent conduct, misrepresentation, or suppression of material facts renders it void, ab initio. 2 Wildm. Int. Law, 250; 1 Duer, Ins. 594, 602; 5 C. Rob. Adm. 269; 6 C. Rob. Adm. 69; 14 East, 484. The intent of the grantor must be observed, in entire good faith, both in the mode of procuring and of using it. 2 Wildm. Int. Law, 245; 1 Duer, Ins. 598; 4 C. Rob. Adm. 11, 96, 263. Its use must be confined to the specified person, merchandise, voyage, modes of trade, and other particulars contained in it. It is not negotiable, and cannot be used to cover the property of other persons than those named, or any property not named. The licensee cannot use it to cover even the property of those for whom he sees fit to act as agent. 2 Dod. 48; 1 Dod. 508; 1 Taunt. 122; 16 East, 3; 2 Wildm. Int. Law, 254; 4 C. Rob. Adm. 263, 267. A slight deviation as to quantity, when not attributable to design, or involving fraud, will not be held fatal; but no deviation as to quality of goods is permissible. Each case will be scrutinized so as to reach the bona fides of the transaction, and effect the sovereign's intent. Quantity may not always be of importance, but quality; that is, a difference in kind, or as to the contraband character of goods, may be of serious import. 1 Edw. 363, 365, 371, 336, 337; 1 Dod. 241; 4 C. Rob. Adm. 11, 96; 5 C. Rob. Adm. 141. A fraudulent application always vitiates the license, and exposes to confiscation all goods embraced within it, whether innocent or contraband in quality; nor in all cases is the fraudulent applicant the only party who suffers. A person whose goods are included in the terms of the license, may be deprived of its protection, although he was not a party to the fraud. 1 Duer. Ins. 618. The grantee, when named, must be truly described, and the privilege granted must be exercised by him in the character which the licensee attributes to him. 14 East, 484; 4 Taunt, 605; 1 Bing. 473. If it requires the goods to belong to him, he must prove property, absolute or special, to be in him, and a consignment to him by a general bill of lading is not sufficient. 1 Duer Ins. 606. Similar doctrines run through the cases in all

branches of this department of law. Thus all goods on a vessel, belonging to the same owner, share the fate of the contraband portion. 3 Phil. Ev. § 275; 1 Duer, Ins. 625; 4 C. Rob. Adm. 199, 260; 5 C. Rob. Adm. 275, 325, and cases cited in U. S. v. One Hundred .and Twenty-Nine Packages, supra. By the ancient rule, a ship with contraband cargo on board was lawful prize, but by ·the modern, she is not condemned therefor, although she always suffers the loss of freight and expenses. If her destination, however, was false, or her owner was in privity with the contraband shipper, or was guilty of concealment, or of misconduct, or was owner of any part of the contraband cargo, or in any manner tainted with the contraband transaction, then his interest in the ship is confiscable. 3 Phil. Ev. § 276; 1 Duer, Ins. 625; 1 Act. 25; 1 C. Rob. Adm. 288, 329; 16 East, 13; 3 C. Rob. Adm. 178, 221, 295; 2 C. Rob. Adm. 6; 6 C. Rob. Adm. 125; 4 C. Rob. Adm. 68; 1 Duer, Ins. 594 et seq. It is thus seen that the doctrine of licenses, as laid down by publicists and courts, requires the licensee to act in entire good faith; first in procuring the license, and next in the use made of it. He is always held to the terms of the grant. If it is confined in its privileges to a particular person, or to that person as acting in a specified capacity, or to particular kinds of goods, or to trade between named ports, or to specified voyages, or routes of travel, it cannot be used otherwise. If the modes of procuring it are specifically defined, there must be no material deviation therefrom. It is, in short, a special privilege granted by the sovereign, not for the benefit of the grantee, but for the good of the state. The sovereign, therefore, determines on what conditions the grant is to be made, and in what manner the privilege may be used. Every one of his subjects, and every subject of the adverse belligerent, having been placed in a condition of legal hostility by the sovereign act of declaring war, no one can be excepted therefrom without another exercise of the same sovereign power. To what extent and under what circumstances the rigors of war, as to a particular person or place, may be relaxed, the sovereign alone can determine. His decision is based on grave reasons of state policy, connected with the objects for which the war is waged, or with its successful prosecution. If he deems it wise, in furtherance of the national design, to permit one of his own subjects, or even an alien enemy, to carry on a particular trade, or prosecute a particular voyage, or hold prescribed intercourse between the adverse belligerents, he can grant the necessary license therefor, on such conditions, and subject to such restrictions or limitations. as he deems the public good demands. The paramount consideration in all such cases is the public good, and the licensee must, in no respect, lose sight thereof, or fail to act in entire good faith with respect to any of the conditions or terms of the license granted to him.

The act of July 13th, 1861, the supplementary act of May 20th, 1862, and the regulations for permits, are based on similar legal principles. All commercial intercourse with Tennessee is prohibited, except in such cases as are licensed, and the licensees must always confine themselves strictly to the terms of the grant, and be in nowise guilty of thwarting the national objects for which such grants are made. As the leading object of the government is the suppression of the existing insurrection, and consequent restoration of constitutional supremacy over all the insurrectionary states, its policy in the furtherance of that object, as the competent authorities have decided, demands temporary suspension of all commercial intercourse with the insurrectionary districts, except under specified circumstances. What those circumstances may justify, from time to time, is to be ascertained from the regulations as made. The application of these rules to the case under consideration leaves no room for doubt. The claimants, in person, complied with none of the required conditions. Harman was their agent, or he was not. If he was their agent, by authority previously derived from them, or by their subsequent ratification, they are bound by his acts. The permit which he procured was obtained by false invoices and false swearing. He evidently was furnished with copies of their invoices, either by themselves or by their vendors; and from the evidence it is manifest that the copies must have been obtained from them. That permit is therefore fraudulent and void. But whether he was their agent or not, it is the only permit under which the goods were shipped. From the evidence in the cause, they have not satisfactorily explained their connection therewith. It was for them, by clear and explicit proofs. to establish their case. They have not done ·so. Their goods stand affected by the fraud, and must share the fate of the contraband articles. If Harman was not their agent in this transaction, then they shipped the goods in dispute without any permit whatever, and the same legal consequence follows. Independent of the apparent fraud, the permit covered none of Harman & Daily's goods, and could not be lawfully used for such a purpose. They were not named in the permit as applicants or consignees. The license was personal to Hicks & Cocke; it covered only their shipments; it was not negotiable or transferable; it could not be made to include anything not specified in it. The attempt to use it otherwise, worked a forfeiture of the whole shipment. The claim is dismissed, with costs, and the property declared forfeited.